IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LAURINDA DODGEN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 21-cv-00086 |
| v. | ) |
| | ) Judge Andrea R. Wood |
| AARP, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Laurinda Dodgen, an African-American woman over the age of forty, claims that while working for Defendant AARP she suffered discrimination because of her race, gender, and age. Accordingly, she has sued AARP pursuant to 42 U.S.C. § 1981 ("Section 1981"); Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*; and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621. AARP has filed a motion to dismiss all claims pursuant to Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 21.) For the reasons stated below, AARP's motion is granted.

**BACKGROUND**

For purposes of AARP's motion to dismiss, the Court accepts as true all well-pleaded facts in the First Amended Complaint ("FAC") and views those facts in the light most favorable to Dodgen as the non-moving party. *Killingsworth v. HSBC Bank Nev., N.A.*, 507 F.3d 614, 618 (7th Cir. 2007). The FAC alleges as follows.

Dodgen began working at AARP in 2010. (FAC ¶ 17, Dkt. No. 16.) While there, she received positive reviews and experienced professional success. (*See id.* ¶¶ 17–83.) But she also had negative experiences with two of her supervisors: Bob Gallo, a white man, and Mary

Anderson, a white woman. (*Id.* ¶ 12.) Some of the alleged experiences involving Anderson occurred before Anderson became Dodgen's supervisor or before Anderson even became an AARP employee. For instance, in 2015, when Anderson was working as an independent contractor for AARP, she allegedly clapped her hands and snapped her fingers in the faces of Dodgen and Carmenza Milan (another minority female AARP employee) during a meeting. (*Id.* ¶¶ 85–86.) Both Dodgen and Milan were upset by Anderson's actions and reported the conduct; and shortly thereafter, Anderson apologized. (*Id.* ¶¶ 87–91.)

Years later, in January 2019, Anderson was hired by Gallo and became Dodgen's direct supervisor. (*Id.* ¶ 84.) Tensions arose at the very first meeting between Anderson and Dodgen on January 23, 2019. (*Id.* ¶¶ 92–98.) Dodgen wanted to discuss a volunteer's disappointment with AARP's failure to sponsor an event. (*Id.* ¶ 92.) In response, Anderson stated that she "felt attacked" by Dodgen. (*Id.* ¶ 93.) Dodgen replied that she was uncomfortable with that characterization, noting that she believed Anderson was relying on a racial narrative that African-American women are "angry." (*Id.* ¶ 94.) When Anderson responded that she felt she had to defend herself, Dodgen retorted that there was no need to do so because Dodgen understood that the decision was Gallo's, not Anderson's. (*Id.* ¶¶ 96–97.)

On April 23, 2019, Dodgen participated in a meeting with Gallo and Anderson. (*Id.* ¶ 133.) Both Gallo and Anderson informed Dodgen that she had been acting differently since returning from her assignment as Interim National Vice President, and that colleagues had noticed and were worried for her. (*Id.* ¶¶ 133–34.) When Dodgen stated that she thought her colleagues would have raised any concerns with her directly, Anderson interrupted and yelled, "That's why we are here today," pointing across the table to Dodgen. (*Id.* ¶¶ 135–36.) After that outburst, Dodgen stated that she felt attacked by Anderson. (*Id.* ¶ 137.) And following the meeting, Dodgen spoke to her

2

three colleagues, who denied sharing any concerns with Gallo and Anderson. (*Id.* ¶ 138.) Gallo raised the issue again during a meeting in June 2019, but Dodgen's colleagues denied making such comments and instead indicated that they had given her a favorable review. (*Id.* ¶¶ 139, 141–42.)

In May 2019, Dodgen repeatedly asked Anderson to go over sponsorship plans, either in a one-on-one meeting or with the rest of the team. (*Id.* ¶¶ 100–12.) During each meeting, however, Anderson would run out of time to discuss the sponsorships. (*Id.*) Even after Dodgen emphasized that a decision had to be made soon, Anderson still delayed raising the issue. (*Id.* ¶¶ 105–12.) According to Dodgen, although Anderson told her that it was her responsibility to make sure that Anderson remembered to add her to the meeting agenda, other colleagues were easily added. (*Id.* ¶ 115.) Dodgen also alleges that approval of her sponsorship plans was delayed by several months as compared to those of two of her female colleagues (one of whom was white), although she further alleges that her white male colleague's projects fell through, possibly because they were the end of a longer project. (*Id.* ¶ 145.)

Later, in June 2019, Anderson accused Dodgen of insubordination with respect to a prior meeting and prevented her from attending a convention as punishment. (*Id.* ¶¶ 169, 173.) Specifically, on June 26, 2019, Dodgen, Anderson, and an AARP human resources employee met to discuss some of AARP's outreach efforts. (*Id.* ¶ 167.) During the meeting, Anderson asked Dodgen to write a letter (the reason and recipient are not included in the complaint). (*Id.*) Dodgen declined to do so, stating that she had a capacity issue that week. (*Id.* ¶ 168.) In response, Anderson sent an email charging Dodgen with insubordination and negatively characterizing Dodgen's actions during the meeting. (*Id.* ¶ 169.) Dodgen replied and disagreed with Anderson's

3

assessment of the situation. (*Id.* ¶ 170.) Dodgen was subsequently told that, because of her workload, she would be unable to attend a convention to which she had been invited. (*Id.* ¶ 173.)

Dodgen and Anderson also clashed over AARP's vacation policy. Anderson requested that staff (including Dodgen) ask her for permission to take vacation time and input requested dates into a master calendar. (*Id.* ¶¶ 176, 182.) Dodgen did not do so, and Anderson remarked that she was surprised when Dodgen took a personal day. (*Id.* ¶¶ 189–91.) Other colleagues confirmed that Anderson had mentioned copying her on emails requesting time off, but one (Ms. Hedderman, a white woman) stated that she was never told to do so and input vacation time only onto a company portal and her own private calendar, just like Dodgen. (*Id.* ¶¶ 194–95.)

In June 2019, Anderson arranged for Dodgen to meet with her in person to go over a "PIP." (*Id.* ¶ 157.)[1] Dodgen asked to reschedule the meeting as she was to attend her daughter's graduation. (*Id.* ¶¶ 158, 161.) Anderson replied that she was unaware Dodgen was planning to be out of the office, to which Dodgen responded that the date for her personal leave had been on her personal calendar for a month. (*Id.* ¶¶ 158–60.) According to Dodgen, Anderson looked "frustrated" with the situation. (*Id.* ¶ 160.) Dodgen suggested that they hold the meeting over the phone, but Anderson insisted that the meeting be in person. (*Id.* ¶¶ 161–62.) Anderson, however, allowed phone meetings for other employees. (*Id.* ¶¶ 163–64.) Dodgen does not specify whether those meetings were also held to review PIPs or for another purpose. (*Id.*)

In July 2019, Anderson took issue with Dodgen regarding her return from sick leave. (*Id.* ¶ 116.) The day before Dodgen returned to the office, she communicated to Anderson her intention to return. (*Id.* ¶ 117.) Anderson instructed Dodgen to bring in a doctor's note, a request allegedly contrary to both AARP policy and Dodgen's rights under the Health Insurance

---

[1] Presumably, the FAC intends "PIP" to refer to a performance improvement plan.

Portability and Accountability Act of 1996. (*Id.*) On July 12, 2019, the day Dodgen returned to work, Anderson called and emailed Dodgen multiple times to confirm her whereabouts. (*Id.* ¶¶ 116–28.) Dodgen was unreachable that morning as she had several meetings with colleagues, had forgotten her cellphone at home, and had computer issues that made it impossible for her to access her email. (*Id.* ¶¶ 118–21.) Anderson berated Dodgen for failing to check in, stating that it was a violation of AARP policy for staff not to check in after returning from leave. (*Id.* ¶¶ 122–25.) At the end of that conversation, Anderson asked if Dodgen had seen an email Anderson had sent to her, warning her that all the items included therein needed to be completed by Monday. (*Id.* ¶¶ 126–27.) Anderson also informed Dodgen that she would discuss her "insubordination" on Monday and warned her that she was "this close." (*Id.* ¶¶ 127–28.)

Dodgen also describes several other instances when she says she was treated differently than her colleagues. For example, Dodgen alleges that she was reprimanded for using her computer during team meetings, even though she and a similarly-situated white female co-worker had done so for years. (*Id.* ¶¶ 129–31.) A similarly-situated white male co-worker was also allowed to have his computer on during meetings. (*Id.* ¶ 132.) Dodgen further claims that on several occasions, she was told that she was not working with her colleagues and needed to work on her communication. (*Id.* ¶¶ 146–47.) Dodgen's colleagues, however, confirmed that their office structure was more "siloed" and that Dodgen, if asked, would assist colleagues and work on a team. (*Id.* ¶¶ 149–50.) Dodgen also alleges that, in 2018, she had similar output to a white female co-worker, yet Dodgen was admonished and received lower marks on her year-end review.[2] (*Id.* ¶¶ 187–88.) Finally, sometime in 2019, Gallo reassigned a project that Dodgen had successfully

---

[2] Although Dodgen alleges that Anderson became her supervisor in 2019, she does not state who admonished her or filled out her year-end review in 2018.

revived to a white male colleague without explanation. (*Id.* ¶ 203.) Unhappy with the situation, Dodgen eventually left AARP.[3]

## DISCUSSION

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This pleading standard does not necessarily require a complaint to contain detailed factual allegations. *Twombly*, 550 U.S. at 555. Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678).

In her FAC, Dodgen asserts claims for race discrimination pursuant to Section 1981 (Count I) and Title VII (Count II), sex discrimination pursuant to Title VII (Counts III and IV),[4] and age discrimination pursuant to the ADEA (Count V).[5] For each claim, Dodgen asserts that she

---

[3] Dodgen's FAC contains no factual allegations regarding the date or manner of her departure from AARP. However, the attached Equal Employment Opportunity Commission charge indicates that her end date was August 16, 2019.

[4] Counts III and IV, each alleging sex discrimination, are duplicative of each other.

[5] The analysis of whether allegations of racial discrimination in the workplace are actionable is identical under Section 1981 and Title VII. *Smith v. Chi. Transit Auth.*, 806 F.3d 900, 904 (7th Cir. 2015). Additionally, the Court notes that the Seventh Circuit has assumed, but not yet decided, that a plaintiff may bring a hostile work environment claim under the ADEA. *Kawcyznski v. F.E. Moran, Inc.*, 238 F. Supp. 3d 1076, 1085–86 (N.D. Ill. 2017) (citing *Raciot v. Wal-Mart Stores, Inc.*, 414 F.3d 675, 678 (7th Cir. 2005)). This Court accordingly assumes for purposes of this motion that Dodgen's hostile work environment claim is actionable under the ADEA.

was subjected to a hostile work environment based on her protected characteristics and constructively discharged.[6] The Court addresses each claim in turn.

### I. Hostile Work Environment Claims

To establish a hostile work environment claim, the plaintiff must show that they were subject to unwelcome harassment, that the harassment was based on a protected characteristic, that the harassment was severe or pervasive and created a "hostile or abusive situation," and that there is a basis for employer liability. *Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 895–96 (7th Cir. 2016) (race); *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840 (7th Cir. 2009) (sex); *Stone v. Bd. of Trs. of N. Ill. Univ.*, 38 F. Supp. 3d 935, 945 (N.D. Ill. 2014) (age). Not only must the harassment be based on a protected characteristic, but the plaintiff must also show that it was so "severe and pervasive as to alter the conditions of the employee's environment." *Mason v. S. Ill. Univ. at Carbondale*, 233 F.3d 1036, 1043 (7th Cir. 2000). This standard is high, and "relatively isolated instances of non-severe misconduct will not support a hostile environment claim." *Saxton v. America Tel. & Tel. Co.*, 10 F.3d 526, 533 (7th Cir. 2000) (internal quotation marks omitted); *see also Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001) ("[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." (internal quotation marks omitted)).

Here, Dodgen fails to plead facts that rise to the level of "severe" and "pervasive" conduct sufficient to create a hostile work environment. In considering whether a plaintiff has alleged facts

---

[6] For each of her discrimination claims, Dodgen also asserts that she suffered an adverse action in the form of AARP's failure to give her assignments. Dodgen provides no factual allegations to support that she was not given assignments or that she was given worse assignments than other colleagues, but simply notes that one time a project she was working on was reassigned to a white male colleague. Instead, the bulk of the FAC focuses on the multiple allegations that form the basis for her hostile work environment and constructive discharge claims. Additionally, in her reply brief, Dodgen focuses solely on claims related to hostile work environment and constructive discharge.

sufficient to sustain a claim for a hostile work environment, courts consider the totality of the circumstances. *Demkovich v. St. Andrew the Apostle Parish, Calumet City*, 3 F.4th 968, 977 (7th Cir. 2021). Among the relevant factors is the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Saxton*, 10 F.3d at 534 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). Dodgen's allegations mainly involve a series of reprimands or negative performance evaluations,[7] some for conduct that she admits failed to conform with policies that other colleagues were expected to follow (such as when Anderson chastised Dodgen for not uploading her vacation schedule to a master calendar).

But "to rise to the level of a hostile work environment, conduct must be sufficiently severe or pervasive to alter the conditions of employment such that it creates an ***abusive*** relationship." *Huri v. Office of the Chief Judge of the Circuit Court of Cook Cnty.*, 804 F.3d 826, 834 (7th Cir. 2015). In other words, even though "a workplace need not be 'hellish' to constitute a hostile work environment, a hostile work environment must be so pervaded by discrimination that the terms and conditions of employment are so altered." *White v. Fidelity Brokerage Servs., LLC*, No. 19-cv-00582, 2019 WL 6052398, at *4 (N.D. Ill. Nov. 15, 2019) (quoting *Alamo v. Bliss*, 864 F.3d 541, 550 (7th Cir. 2017)). While Dodgen may have been unhappy with Anderson's management, or felt unfairly scrutinized, nothing in the complaint plausibly suggests that Anderson's or Gallo's actions towards Dodgen rose to the level of hostility required to sustain a hostile work environment claim. For better or worse, "[m]any employees have to put up with some amount of

---

[7] While Dodgen claims she was reprimanded by Anderson (and, to some extent, Gallo), she does not allege that she was ever subjected to any formal disciplinary action. Dodgen does mention that she was on a PIP. But she does not plead any facts concerning why or when she was placed on a PIP, who placed her on one, or even whether having a PIP was standard practice for employees.

rude, arrogant, or boorish behavior at work." *Patton v. Indianapolis Pub. Sch. Bd.*, 276 F.3d 334, 339 (7th Cir. 2002). Anderson's actions may have negatively affected Dodgen's work experience, but there are no allegations suggesting that they so "altered the terms and conditions of employment" as to make it abusive.

Dodgen puts up little resistance to AARP's motion—failing to respond substantively to AARP's arguments. Instead, Dodgen repeatedly asserts that, because the complaint alleges numerous facts, assertions, and allegations related to discrimination, it is premature to dismiss the complaint at this stage.[8] Indeed, Dodgen appears to take the position that claims for hostile work environment can never be decided at the motion to dismiss stage. Yet courts frequently dismiss insufficiently pleaded hostile work environment claims at the motion to dismiss stage. *See, e.g.*, *Muhammad v. Univ. of Chi.*, No. 16-cv-09998, 2019 WL 13075598, at *3 (N.D. Ill. Mar. 31, 2019) (dismissing hostile work environment claims pursuant to Rule 12(b)(6) where the plaintiff failed to allege sufficiently that the defendants' conduct interfered with her ability to do her job); *Watkins v. City of Chicago*, No. 17 C 2028, 2018 WL 2689537, at *8 (N.D. Ill. June 5, 2018) (noting that Title VII is not a "general civility code" and dismissing the claim when none of the plaintiff's allegations suggested that the conduct was severe or pervasive enough to constitute a hostile work environment (quoting *Oncale v. Sundower Offshore Servs. Inc.*, 423 U.S. 75, 80 (1998))).[9]

---

[8] Dodgen also contends that the Court should consider business records and sworn affidavits attached to the complaint in deciding this motion. But no such documents are attached to the amended (and now operative) complaint. Instead, Dodgen appears to be referencing exhibits attached to her original complaint. The attached documents consist of a complete record of Dodgen's internal reviews at AARP and three sworn declarations. Of the declarations, none offer personal knowledge of any discriminatory conduct towards Dodgen based on her membership in protected classes.

[9] Because Dodgen fails to allege conduct severe or pervasive enough to sustain her hostile work environment claims, the Court need not address her reliance on *Cole* for the proposition that facially

9

For these reasons, Dodgen's claims for hostile work environment are dismissed.[10]

## II. Constructive Discharge

A constructive discharge occurs when "the plaintiff shows that she was forced to resign because her working conditions, from the standpoint of the reasonable employee, had become unbearable." *Fischer v. Avanade, Inc.*, 519 F.3d 393, 409 (7th Cir. 2008) (internal quotation marks omitted). The Seventh Circuit "has recognized two different forms of constructive discharge, but neither dispenses with the requirement that the work environment had become intolerable." *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010). For the first form, where the employee "resigns due to alleged discriminatory harassment," the plaintiff must "show working conditions even more egregious than that required for a hostile work environment claim because employees are generally expected to remain employed while seeking redress, thereby allowing an employer to address a situation before it causes the employee to quit." *Wright v. Ill. Dept. of Child. & Fam. Servs.*, 798 F.3d 513, 527 (7th Cir. 2015) (internal quotation marks omitted). In contrast, the second form "occurs when an employer acts in a manner so as to have communicated to a reasonable employee that she will be terminated." *Id.* (internal quotation marks omitted).

Regardless of which form of constructive discharge she claims, Dodgen fails to state a claim. To begin, Dodgen has not alleged that she was led to believe that she would be terminated.

---

neutral forms of harassment may nonetheless be motivated by hostility to a plaintiff's protected status. 838 F.3d at 896.

[10] Alternatively, the Court notes that Dodgen's claims for age discrimination must be dismissed for lack of any factual basis. Beyond noting her age (over 40), Dodgen never mentions her age, the age of any of her colleagues, or any allegation that could lead to the plausible inference that she was discriminated against because of her age. *See Blickle v. Ill. Dept. of Children & Family Servs.*, No. 12 C 9795, 2013 WL 2467651, at *5 (N.D. Ill. June 7, 2013) (dismissing a complaint where it was "devoid of any allegations that plausibly suggest she was discriminated against on the basis of her age" where, outside of pleading her age and that her colleagues were younger, the plaintiff provided no further factual allegations in support of her claim).

In fact, outside of the fact that Dodgen left AARP in August 2019, Dodgen provides no factual allegations related to her departure at all. *See Parks v. Speedy Title & Appraisal Review Servs.*, 318 F. Supp. 3d 1053, 1065–66 (N.D. Ill. 2018) (dismissing a claim for constructive discharge absent allegations that anyone "communicated to [the plaintiff] that her employment there would be terminated" and where the conduct alleged, which included technical issues, discipline, and hostility, were not "sufficiently egregious"). Dodgen does, in passing, mention being placed on a PIP. (FAC ¶¶ 157–64.) But she does so in the context of describing how Anderson required her to meet to discuss her PIP in-person rather than over the phone, and Dodgen does not allege that the PIP itself was an adverse employment action or caused her to feel that she was being forced out of her job. Nor, for the reasons discussed above, has Dodgen alleged facts sufficient to support a hostile work environment claim, let alone a constructive discharge claim. *See Gilhooly v. UBS Sec., LLC*, 772 F. Supp. 2d 914, 917–18 (N.D. Ill. 2011) (explaining that "[c]onstructive discharge must be based upon grossly offensive conduct and commentary").

The Court again notes that Dodgen fails to respond meaningfully to any of AARP's arguments. Dodgen contends, in essence, that because constructive discharge gives rise to a cause of action, and she has laid out a timeline of events that (presumably) led to her resignation, she has successfully pleaded her claim. But beyond the conclusory statement that she has provided a timeline, Dodgen points to nothing to rebut AARP's argument that the alleged events, even considered collectively, fail to satisfy the standard required to plead a claim for constructive discharge successfully. "If [a court is] given plausible reasons for dismissing a complaint, [the court is] not going to do the plaintiff's research and try to discover whether there might be something to say against the defendant's reasoning." *Kirksey v. R.J. Reynolds Tobacco Co.*, 168 F.3d 1039, 1041 (7th Cir. 1999). When faced with legal arguments for why her claim was

11

deficient, it is not enough for Dodgen to merely stand on her complaint—she must respond substantively to the motion to dismiss. *Id.* at 1043.

## CONCLUSION

For the reasons stated above, AARP's motion to dismiss is granted. The complaint is dismissed without prejudice. The Court grants Dodgen leave to file a second amended complaint that remedies the deficiencies discuss in this memorandum opinion, if she is able to do so consistent with the requirements of Federal Rule of Civil Procedure 11, by October 21, 2022. If Dodgen declines to submit a second amended complaint by that date, her case will be dismissed with prejudice.

ENTERED:

Dated: September 30, 2022

_____
Andrea R. Wood
United States District Judge